STATE ex rel. LANTZ et al., Appellants, v. MORRIS et al., Respondents.

(No. 8,256.)

(Submitted March 3, 1942. Decided March 26, 1942.)

[126 Pac. (2d) 1101.]

*Appeal from District Court, Rosebud County; Rudolph Nelstead, Judge.*

Mr. E. E. Fenton, for Appellants, submitted an original and a reply brief, and argued the cause orally.

Mr. T. W. Carolan, for Defendants, and Mr. J. J. McIntosh and Mr. D. L. O'Hern, for Interveners, submitted a brief; Mr. McIntosh argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

Relators, individually as taxpayers and as trustees of School Districts No. 32 and No. 3, respectively, in Rosebud county, have brought this action in prohibition. The action seeks to prohibit the defendants from apportioning to School District No. 4 the per capita apportionment of school moneys on account of school children residing in a certain area for the year 1940 and subsequent years. The action was brought against the county commissioners and county superintendent of Rosebud county. School District No. 4 and its trustees intervened. The question involved is whether the territory in question is a part of School District No. 4 so as to entitle the latter to share in the apportionment of school funds in proportion to the number of children residing in such territory.

The facts disclosed by the pleadings and the evidence briefly summarized are as follows: District No. 4 maintains a school in the city of Forsyth, and according to its contention its territorial boundaries embrace three distinct territorial units. One of these territorial units embraces the Forsyth school and some territory immediately adjacent thereto, being designated as "4." The second embraces a noncontiguous tract of land many miles north from the Forsyth area, designated as "4-A," and the third tract comprises a unit many miles south of the Forsyth unit, designated as "4-B" and which is the territory involved in this action. The three tracts of land are noncontiguous and are many miles distant one from the other, and between any two of them are situated other school districts. The Forsyth area consists of 153 square miles, the area to the north, or Unit 4-A, consists of 78 square miles, and the one to the south, or Unit 4-B, 210 square miles. The entire Unit 4-B is on a part of the Northern Cheyenne Indian Reservation, and there are living in the unit approximately 200 children of school age. No free public school is maintained on that unit, but two schools, one a government and the other a mission school, are held in the area. School Districts Nos. 32 and 3 both adjoin

the area in 4-B. Four other school districts border upon the area embraced in 4-B.

The county of Rosebud was created by the legislature in 1901 and District No. 4 had existed prior to that time. After the creation of the new county the county superintendent thereof ·evidently assumed to include all unattached territory in District No. 4 under the guise of complying with section 1741 of the Political Code of 1895, for at pages 68 and 69 of Volume 1 of the Commissioners' Journal appears the following minute under date of September 4, 1901: ''The recommendations of the County Superintendent which read as follows: 'All territory in Rosebud County, not plainly and definitely described as being in any district in Rosebud County is today annexed to Dist. No. 4. The boundaries of Dist. No. 4 shall be as at present described in the records of Rosebud County and also including all the region of the county not included in any other district in the county.' Harmonized according to Sèction 1741 of the School Law—is accepted.'' This description was approved again by the county commissioners on December 7, 1903, and again on June 6, 1904, and again on June 7, 1909. The main question involved is whether this action was sufficient to place the territory 4-B in District No. 4.

The law in effect at the time the foregoing proceedings were taken was section 1741 of the Political Code of 1895. That section became section 834 of the Political Code of 1907 and is now section 968, Revised Codes of 1935. It provides: ''The county superintendent shall inquire and ascertain whether the boundaries of school districts in the county are definitely and plainly described in the records of the board of county commissioners, and keep in his office a full and correct transcript of such boundaries. In case the boundaries of districts are conflicting, or are incorrectly described, he shall change, harmonize, and describe them, and make a report of such action to the commissioners; and on being ratified by the commissioners, the boundaries and descriptions so made shall be the legal boundaries and descriptions of the districts of that county. The

county superintendent shall furnish the several district clerks. with descriptions of the boundaries of their respective districts.''

The only authority existing at that time to change the boundaries of a school district was section 1752 of the Codes of 1895, which became section 841 of the Political Code of 1907, and which provided in part: "The boundaries of any district cannot be changed, except in forming new districts,. unless a majority of heads of families residing on the territory which it is proposed to transfer or include, present a petition. in writing to the county superintendent which petition shall describe the change which it is proposed to have made.''

Here there was no such petition presented in 1901, 1903, 1904, 1909, or at any time. The only attempt to place 4-B in. District No. 4 was by attempting to describe the boundaries of No. 4 as embracing all territory not included in any other district. There was no authority on the part of the county superintendent or the board of county commissioners, under the guise of defining boundaries under section 1741, to reach out and include in an existing school district tracts of land theretofore not included therein. Section 1741 simply authorized the county superintendent to make such minor changes as were necessary to make the boundaries definite and certain, but it did not authorize him of his own motion, or the county commissioners, completely to change the boundaries of the existing district by attaching to it all lands wherever situated in the county not a part of any school district.

There is much argument in the briefs devoted to the question as to whether it was proper prior to 1915 to form a school district out of two or more noncontiguous tracts of land. Since the passage of Chapter 112, Laws of 1915, it is clear that this may not be done. From what we have said above, it is unnecessary to determine whether it was proper to do so prior to 1915. It is worthy of note, however, to point out that section 1752 of the Political Code of 1895, which was in effect at the time 4-B was attempted to be placed in District No. 4, contains this. provision: "provided, that two or more districts lying con-

tiguous may, upon a petition of a majority of the heads of families residing in each of said districts presented to the county superintendent in writing, be united to constitute but one district."

This tends strongly to support the conclusion that the legislature at that time took it for granted that noncontiguous territory should not be embraced within one school district. The record does not reveal any other attempt than those above referred to, to place 4-B in District No. 4. Those attempts having been futile, we hold that the territory embraced in 4-B is not now and never has been a part of District No. 4.

This being so, we must determine whether District No. 4 is entitled to an apportionment of the school moneys on the basis of the Indian children residing therein. Section 1204, Revised Codes, contemplates that Indian children shall be included in making the apportionment of school moneys. However section 5, Article XI of the Constitution provides that the apportionment shall be made "to the several school districts of the state in proportion to the number of children and youths between the ages of six and twenty-one residing therein respectively." Since the children in 4-B do not reside within any school district, it is improper to include them in the apportionment. It follows that District No. 4 is not entitled to receive the apportionment based upon these Indian children.

It is contended by respondents that relators are not bene- ficially interested in maintaining this action, since under no theory are they entitled to claim that 4-B is a part of Districts 32 or 3. It follows, as a matter of course, that if the moneys apportioned to District No. 4, based upon the number of Indian children residing in 4-B, are not paid to it, other districts will be entitled to more per capita, and hence the other districts are beneficially interested in preventing disssipation of the school funds.

The record discloses that in 1937 an action was brought by School District No. 32 against the county superintendent of schools of Rosebud county, the trustees of District No. 4 and

the county treasurer to compel the county superintendent to place 4-B in a contiguous school district on the theory that it was then not attached to any school district. The court rendered judgment in favor of defendants, and found that 4-B was a part of District No. 4. No appeal was taken from that judgment. Respondents contend that the judgment in that action is *res judicata*. It is sufficient answer to this contention to say that in this case there are different parties relator. School District No. 3 and its trustees individually as taxpayers were not parties to that action, and the trustees of District No. 32 in that action did not appear as taxpayers as in this action. There is no merit to this contention.

It follows that the district court was in error in entering judgment for respondents. The judgment is reversed and the cause remanded with direction to enter judgment for relators.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES ERICKSON and ANDERSON concur.

MR. JUSTICE MORRIS: I dissent.

Rehearing denied May 27, 1942.